UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TONIA VEL LLEWELLYN,<br>Plaintiff,<br>v.<br>COMMISSIONER OF SOCIAL SECURITY,<br>Defendant. | Case No. 17-cv-05571-DMR<br><br>**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT**<br>Re: Dkt. Nos. 16, 17 |

Plaintiff Tonia Llewellyn ("Llewellyn") moves for summary judgment to reverse the Commissioner of the Social Security Administration's (the "Commissioner's") final administrative decision, which found Plaintiff not disabled and therefore denied her application for benefits under Title II of the Social Security Act, 42 U.S.C. § 401 et seq. The Commissioner cross-moves to affirm. For the reasons stated below, the court grants Llewellyn's motion in part, denies the Commissioner's cross-motion, and remands this case for further proceedings.

**I. PROCEDURAL HISTORY**

Llewellyn filed an application for Social Security Disability Insurance (SSDI) benefits on April 1, 2014, which was initially denied on June 23, 2014 and again on reconsideration on December 9, 2014. Administrative Record ("A.R.") 75, 88, 103, 104-09, 113-19. On December 15, 2014, Llewellyn filed a request for a hearing before an Administrative Law Judge (ALJ). A.R. 120-121. ALJ Mary Beth O'Connor held a hearing on April 22, 2016. A.R. 39-74, 146-165.

After the hearing, ALJ O'Connor issued a decision finding Llewellyn not disabled. A.R. 20-34. The ALJ determined that Llewellyn has the following severe impairments: depression, anxiety, post-traumatic stress disorder, attention deficit hyperactivity disorder, status post right hip reconstructive surgery, and obesity. A.R. 22. The ALJ found that Llewellyn retains the following residual functional capacity (RFC):

> [C]laimant has the residual functional capacity to perform light work as defined in 20 CFR [§] 404.1567(b) except: The claimant can frequently climb ramps and stairs and occasionally climb ladders, ropes, and scaffolds. The claimant can frequently balance, stoop, kneel, and crouch. The claimant can occasionally crawl. The claimant can perform simple, routine tasks. The claimant can engage in brief, superficial contact with the public.

A.R. 24. Relying on the opinion of a vocational expert (VE) who testified that an individual with such an RFC could perform other jobs existing in the economy, including as a garment folder, laundry worker, and retail marker, the ALJ concluded that Llewellyn is not disabled. A.R. 33; AR 65-66.

The Appeals Council denied Llewellyn's request for review on August 2, 2017. The ALJ's decision therefore became the Commissioner's final decision. *Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1231 (9th Cir. 2011). Llewellyn then filed suit in this court pursuant to 42 U.S.C. § 405(g).

## II. THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents her from engaging in substantial gainful activity[1] and that is expected to result in death or to last for a continuous period of at least twelve months. *Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)). The impairment must render the claimant incapable of performing the work she previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry. 20 C.F.R. §§ 404.1520, 416.920. The steps are as follows:

1. At the first step, the ALJ considers the claimant's work activity, if any. If the claimant is doing substantial gainful activity, the ALJ will find that the claimant is not disabled.

2. At the second step, the ALJ considers the medical severity of the claimant's impairment(s). If the claimant does not have a severe medically determinable physical or mental

---

[1] Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit. 20 C.F.R. §§ 404.1510, 416.910.

1   impairment that meets the duration requirement in [20 C.F.R.] § 416.909, or a combination of impairments that is severe and meets the duration requirement, the ALJ will find that the claimant is not disabled.

3.  At the third step, the ALJ also considers the medical severity of the claimant's impairment(s). If the claimant has an impairment(s) that meets or equals one of the listings in 20 C.F.R., Pt. 404, Subpt. P, App. 1 [the "Listings"] and meets the duration requirement, the ALJ will find that the claimant is disabled.

4.  At the fourth step, the ALJ considers an assessment of the claimant's residual functional capacity ("RFC") and the claimant's past relevant work. If the claimant can still do his or her past relevant work, the ALJ will find that the claimant is not disabled.

5.  At the fifth and last step, the ALJ considers the assessment of the claimant's RFC and age, education, and work experience to see if the claimant can make an adjustment to other work. If the claimant can make an adjustment to other work, the ALJ will find that the claimant is not disabled. If the claimant cannot make an adjustment to other work, the ALJ will find that the claimant is disabled.

20 C.F.R. § 416.920(a)(4); 20 C.F.R. §§ 404.1520; *Tackett*, 180 F.3d at 1098-99.

## III. FACTUAL BACKGROUND

### A. Llewellyn's Testimony

Llewellyn was born on May 5, 1975, and was 41 at the time of the April 22, 2016 hearing. A.R. 174. At the hearing, Llewellyn testified that she lives with her two children, who were ages sixteen and four at the time. A.R. 45-46. The family lives on food stamps and the SSI benefits that Llewellyn receives for her 16-year-old daughter. A.R. 46. Her brother gets her children ready for school in the morning, and drives them to school every day. A.R. 58-59. He picks them up from school about once a week, while Llewellyn picks them up about three times a week. A.R. 58. Llewellyn's mother also lives nearby and helps her with everyday chores, including most of the cooking and cleaning. A.R. 59.

The last time Llewellyn worked was in 2011, at a senior center. A.R. 47. She quit that job when she became pregnant. She testified that she was "very sick while []pregnant and I had shingles

and I was in such a bad depression that I could no longer work and I quit." A.R. 48. She has not looked for work since she quit her job at the senior center. A.R. 48. She stated that she is prevented from looking for work because of her depression and physical pain. A.R. 51. With regard to her depression symptoms, she described "[c]rying, being stuck, not being able to move and accomplish things." A.R. 55-56. She testified that it affects her functioning on a daily basis: "Sometimes I can't even take my garbage out or wash my face or it's like being in the dark. Some days I accomplish a couple of things and sometimes I don't accomplish anything. It's affected me a lot." A.R. 56. She requires help with simple tasks, such as filling out forms, because she cannot "mentally handle" it. A.R. 59-60.

With regard to her PTSD symptoms, Llewellyn stated, "I've had it for years. . . . a lot of times I'm in the past with my thoughts. . . . I'm triggered by things. Painful. And it's like a movie's going on in the head. It's hard to focus on what's going on in reality." A.R. 56. Llewellyn testified that her ADHD symptoms also affect her greatly, and she "can't focus at all" without medication. A.R. 56-57. She has exhibited symptoms of ADHD since childhood, which led to suffering throughout her school years. A.R. 57. With medication, she is "able to focus a little bit", such as reading for 15 or 20 minutes. A.R. 57. She testified that she has trouble completing tasks, and she usually "give[s] up." A.R. 60.

Llewellyn testified that her symptoms vary, and she "usually [has] a couple of good days and a couple of bad days in a week." A.R. 60. She takes several medications for her mental health symptoms. A.R. 49.

**B.  Relevant Medical Evidence**

**1.  Treatment Records**

Llewellyn's treatment records are from Kaiser Permanente Medical Group ("Kaiser") and reflect that she saw various providers at Kaiser through the relevant time span, approximately May 2011 through July 2015. Since only Llewellyn's mental impairments are at issue in this case, the summarized history focuses on treatment she received for those impairments.

**a.  Pregnancy and Delivery (May-June 2011)**

On May 18, 2011, Llewellyn met with Nicole Thomas, M.F.T, for counseling on smoking

4

cessation. A.R. 505. At that time, Llewellyn was pregnant and reported a history of domestic violence with the father of the baby, who she was no longer seeing. A.R. 505-06. She also reported a history of depression and that she was currently depressed. A.R. 506. She gave birth to her son on June 4, 2011. A.R. 530. A social services assessment of Llewellyn after delivery recorded that she was alert, calm, and cooperative, and her mood was euthymic as she was very happy about the baby. A.R. 540. Llewellyn reported that she was living with her 11-year-old daughter at that time, and also had a son in 2008 who she relinquished to her sister at birth. A.R. 541. She said giving up her son had been a difficult decision but she thought it would be best for the baby. A.R. 541. Llewellyn reported that she planned to return to work after taking time off to spend with her newborn. A.R. 541. She told the social worker that the father of her newborn had punched her five times in the stomach when she told him she was pregnant. A.R. 541.

### b.     Zunairah Syed, M.D. (2011-2012)

Llewellyn's treatment records for 2011 and 2012 indicate that she primarily saw Zunairah Syed, M.D. at Kaiser. On September 6, 2011, Llewellyn met with Dr. Syed regarding her depression. A.R. 626. She reported that she had been feeling low and sad lately. A.R. 627. She said that "otherwise she is a very happy go [*sic*] person." A.R. 627. Llewellyn stated that she had been feeling really tired and fatigued. A.R. 627. On a patient health questionnaire, Llewlleyn reported that she had been "feeling down, depressed, or hopeless" nearly every day. A.R. 629. Her symptoms were considered moderately severe. A.R. 629. Dr. Syed issued a prescription for Zoloft. A.R. 628. Later that month, Llewellyn reported to Dr. Syed that she did not like Zoloft as it made her feel tired and she wanted to try Effexor. A.R. 640. Dr. Syed issued that prescription. A.R. 640. In October 2011, Llewellyn told Dr. Syed that Effexor was giving her daily headaches and she was willing to try Prozac. A.R. 642. Dr. Syed then gave her a prescription for Prozac. A.R. 642.

On October 31, 2011, Llewellyn told Dr. Syed that the Prozac prescription was working and she felt a lot better. A.R. 646. She also reported that she had joined a gym and felt like everything was going in the right direction. A.R. 646. However, on February 13, 2012, Llewellyn's depression returned and she requested an increased dose of Prozac. A.R. 649-50. She discussed her history of domestic violence at that time. A.R. 650. Llewellyn reported that she felt unable to return to work

5

but was willing to see a psychiatrist and attend an intensive outpatient program. A.R. 650. Dr. Syed referred her to a psychiatrist. A.R. 661. A few days later, on February 16, 2012, Llewellyn told Dr. Syed that she was following up with the psych referral and was feeling much better. A.R. 661. She felt like she had energy to go and do things. A.R. 661.

### c. Psychiatric Intakes (January-February 2014)

There are no records relating to Llewellyn's mental impairments from approximately February 2012 until January 2014. Llewellyn's 2014 Kaiser records show that she began seeking counseling in January 2014.

On January 14, 2014, Llewellyn met with Judith Heiler, M.D., with renewed complaints of depression. A.R. 683. She reported that she was tearful and had no energy or motivation. A.R. 684. Stressors at that time included her glasses breaking and her car blowing up. A.R. 684. She stated that she had tried Zoloft, Effexor, and Prozac in the past, and none of those medications helped. A.R. 684. Her answers to the health questionnaire indicated severe depression. A.R. 686-687. Dr. Heiler prescribed Wellbutrin and referred her to counseling. A.R. 685. On January 21, 2014, Llewellyn had an intake telephone call for counseling, and reported feeling somewhat better after starting Wellbutrin. A.R. 931. She described her symptoms as including depressed mood, anhedonia, crying spells, significant appetite change, hypersomnia, decreased energy, guilt, hopelessness. A.R. 931. She also reported that she had prior suicide attempts, including attempting to hang herself as a youth, but denied current suicidal ideation. A.R. 931.

Llewellyn had a psychiatric intake on February 10, 2014 with Diana Fox, ACSW. A.R. 927. She reported during the intake that she has been consistently depressed since she was a teenager, although her depression increased after the birth of her son in June 2011. A.R. 928. She stated that sometimes it was so bad that she would not leave her bed for days at a time and was unable to maintain basic cleanliness in her house. A.R. 928. Llewellyn reported that her parents, who live very nearby, step in to care for her two children when she is the most depressed. A.R. 928. She stated that she is particularly concerned about constant fatigue, and sleeping 14 hours or more without feeling refreshed. A.R. 928. She reported that her primary care physician had encouraged her to come to psychiatry for several years. A.R. 928. Llewellyn stated that she had a decrease in

6

depression symptoms after starting Wellbutrin but that the symptoms had begun to increase again. A.R. 928. She also described symptoms of PTSD that resulted from spending 10 years in a violent relationship. A.R. 928. She reported that her ex-boyfriend "ripped off" her eyelid and she had to have it surgically reattached. A.R. 928. He also broke her fingers and toes. A.R. 928. Llewellyn reported that her PTSD symptoms were less severe now and that she had worked with a counselor through the county, which was helpful. A.R. 928. She also described symptoms of ADHD impacting her functioning. A.R. 928. She scored in the very high range on an ADHD assessment. A.R. 928. Llewellyn reported another suicide attempt about 15 years ago, when she swallowed 72 codeine pills. A.R. 929. She did not receive medical care after that incident. A.R. 929.

### d. 2014 Treatment Records

Llewellyn began seeing Ricardo Budjak, M.D., a psychiatrist, on March 3, 2014. A.R. 922. In their initial meeting, she reported that she initially felt better after starting Wellbutrin, but had been in a major depressive episode for about two weeks. A.R. 922. Dr. Budjak noted that it was "[u]nclear why medication has ceased being effective, as she is on no other medications and she is not reporting any new stressors." A.R. 922. Dr. Budjak increased her Wellbutrin dose. A.R. 922. After a week on the increased dose, Llewellyn reported feeling more irritable, angry, and tired, and her dose was decreased again. A.R. 916. She reported feeling better with the lower dose but still presented with the same symptoms as she had initially. A.R.916. Her father reported that she had been very angry, very tired, and "negative inside." A.R. 916. He stated that she was crying a lot and sleeping all day, her thinking wasn't normal, and she had increased nightmares. A.R. 916. Dr. Budjack noted that Llewellyn's symptoms were consistent with a major depressive episode. A.R. 918. Dr. Budjak prescribed Cytomel to augment Llewellyn's antidepressant treatment. A.R. 918.

Llewellyn started therapy sessions with LCSW Fox on May 6, 2014. A.R. 914. On that date, she reported feeling less depressed since her last visit, and feeling more hopeful than she had in many years. A.R. 914. She had celebrated her birthday that week and many people had come "out of the woodwork" to wish her a happy birthday, which made her feel loved. A.R. 914. She went to the movies and out to lunch to celebrate, and she noticed that when she gets out of the house and does activities, it helps her feel happier. A.R. 914. She expressed increased motivation to work

7

on addressing her depression symptoms and actively participated in creating a treatment plan. A.R. 914.

On June 2, 2014, Dr. Budjak's notes indicated that Llewellyn appeared euthymic and that she had responded well to the combination treatment. A.R. 913. Llewellyn reported that her symptoms of depression were significantly improved. A.R. 911. She felt more hopeful, felt like she "has a reason to live again," and denied suicide ideation. A.R. 911. She also found that the cognitive behavioral therapy ("CBT") classes she had started taking were very helpful. A.R. 911. She reported that she was getting some exercise and that it really helped her mood. A.R. 911. She also started a CBT Work Group around June 2014. A.R. 913. Progress notes from her CBT group on June 9, 2014 show that Llewellyn was ecstatic that her parents bought her a new car. A.R. 910. She talked about working on having a nicer home to boost her self-esteem and to be a role model for her daughter. A.R. 910.

Progress notes from June 10, 2014 show that Dr. Budjak increased Llewellyn's Wellbutrin dose again, and noted that part of her depression was related to her weight. A.R 910. He also recommended a new diet pill to her. A.R. 910. Therapy notes from Fox dated June 13, 2014 show that Llewellyn continued to report a decrease in her depression symptoms, and maintained her motivation to engaged in treatment to overcome depression. A.R. 908. She said she was enthusiastic to start a Mindful Mood class in July. A.R. 908. She said that her depression was alleviated since she had a car now and was no longer dependent on others to complete basic tasks like grocery shopping and taking her kids to school. A.R. 908.

Notes from her CBT workshop dated June 23, 2014 show that Llewellyn continued to feel good since getting a car and was going on fun outings with her kids. A.R. 908. On June 30, 2014, Llewellyn reported that she did not feel well that week and was more irritable. A.R. 908. Her parents were concerned that she was "returning to old patterns." A.R. 908. However, she stated that she intended to resume the effort to keep her house tidy and be productive now that she was feeling better. A.R. 908.

On July 8, 2014, Llewellyn followed up with Dr. Budjak for psychiatry. A.R. 905. During that visit, Llewellyn reported that her symptoms of depression were significantly improved, but she

would start to feel irritable and moody about three days before the start of her menstrual cycle. A.R. 906. She also reported having trouble sleeping during that time of the month. A.R. 906. Dr. Budjak started her on a SSRI in addition to Wellbutrin to treat symptoms related to premenstrual dysphoric disorder. A.R. 905.

Fox's therapy notes from July 29, 2014 show that Llewellyn reported an increase in depression symptoms, specifically anhedonia, fatigue, over-sleeping, and psychomotor retardation. A.R. 903. She stated that she thought she was having a bad reaction to Prozac, and described feeling dizzy and mentally foggy since beginning to take it. A.R. 903. Llewellyn told her therapist that "all she wants to do is sleep," but that she is trying to not give into this impulse because she knows it is not in her best interest. A.R. 903. Fox noted that despite Llewellyn's report of increased depression symptoms, her affect was bright in session. A.R. 903.

Llewellyn began a Mindful Mood Management class in August 2014, which she attended through October 2014. A.R. 894-902.

On September 23, 2014, Llewellyn told Dr. Budjak that she began feeling extremely tired after starting Prozac. A.R. 900. She reported that she had stopped the Prozac about a month prior and she felt better but was not completely back to herself yet. A.R. 900. She stated that her mood was stable with the Wellbutrin. A.R. 900. The next week, on September 30, 2014, she told Dr. Budjak that she felt tired all of the time and was sleeping more than usual. A.R. 897. She reported that she was persistently depressed, although the depression had improved since she stopped taking Prozac. A.R. 897. Llewellyn said that she had let herself go and that her house was a mess because she did not have the energy to clean. A.R. 897.

On October 22, 2014, Llewellyn told Fox that her depression symptoms had decreased but her trauma re-experiencing symptoms had increased. A.R. 894. She reported an increase in nightmares, insomnia, and intrusive thoughts, and stated that some of the memories were so upsetting that it caused her to vomit. A.R. 894. She stated that she "just wants it to go away," and was fearful that her medication had increased her trauma symptoms. A.R. 894. Fox noted that Llewellyn was going to start a class called Seeking Safety in two weeks. A.R. 894.

On November 3, 2014, Llewellyn reported to Dr. Budjak that she had been under a lot of

stress and was somewhat depressed but it was manageable. A.R. 892. Two weeks later, she saw him again for issues relating to concentration and attention. A.R. 889. Dr. Budjak noted that these symptoms were likely secondary to untreated ADHD. A.R. 889. He opined that Llewellyn had developed low self-esteem based on her inability to function, organize, and finish tasks, which likely contributed to depression. A.R. 889. He prescribed her Adderall. A.R. 889. Dr. Budjak also noted that Llewellyn's depression was in remission. A.R. 892.

### e. 2015 Treatment Records

On January 9, 2015, Llewellyn met with Dr. Budjak and reported that her symptoms of depression and anxiety had essentially resolved with the addition of Adderall. A.R. 886. She stated that she felt more motivated to take on tasks that she would shy away from previously, and that she had more energy. A.R. 886. Llewellyn reported that she was more focused and could now follow through on tasks, and she was starting to feel good about herself. A.R. 886. Dr. Budjak noted that her depression was in full remission. A.R. 888.

On January 20, 2015, Llewellyn met with her therapist Fox and reported that her PTSD symptoms had remitted since she finished the Mindful Mood class, which had triggered a resurgence of flashbacks and dreams by causing her to reflect on her past. A.R. 884. She stated that she was planning on taking the Seeking Safety class even though her symptoms had decreased because she would like to deal with her past trauma instead of continuing to repress it. A.R. 885. Llewellyn noted that she continued to struggle with depression, although she was working hard to maintain routines that would decrease her depression symptoms. A.R. 885.

On February 19, 2015, Llewellyn reported that she had been doing well since the prior month and made several positive changes in her lifestyle. A.R. 884. She said she had been taking her son to preschool every morning and walking 1-2 miles while he was in school. A.R. 884. She also reported a decrease in nightmares and an increase in being able to enjoy pleasurable activities. A.R. 884.

On March 30, 2015, Llewellyn met with Dr. Budjak and reported that her symptoms of depression, mood swings, and anger had slightly worsened since her last visit. A.R. 881. She reported feeling more labile in her mood and more easily angered since finding out that her friend

had posted private information about the son she gave up for adoption on Facebook. A.R. 881.

The very next day, March 31, 2015, Llewellyn presented in crisis to Fox. A.R. 879. She said that she had been confronted by her ex three weeks ago about the baby she gave up for adoption. A.R. 879. Her ex was the child's father and did not know about the baby until Llewellyn's friend posted about him on Facebook. A.R. 879. He called and confronted Llewellyn about the incident and threatened to kill her entire family as retaliation. A.R. 879. Llewellyn told Fox that the conversation with her ex brought back all of her memories of the abuse he had committed against her and threw her back into a state of feeling paralyzed. A.R. 879. She reported increased depression symptoms in response to the trigger and stated that her parents had taken over care of her preschool son because she was having trouble functioning. A.R. 879.

Psychiatry notes from May 14, 2015 record that Llewellyn had increased focus and concentration while on Adderall, and it helped her be more productive and motivated. A.R. 878.

On June 8, 2015, Llewellyn told her therapist Fox that she continued to struggle with the fallout of her ex learning that she gave up their child for adoption many years ago. A.R. 876. She said that her sister, who adopted the child, had initiated a relationship between her son and his biological father and expressed doubt over Llewellyn's warnings that her ex is dangerous. A.R. 877. Llewellyn said that, despite her depressed mood, she was trying to get back on track with basic self-care and practicing daily hygiene. A.R. 877. She requested a recommendation for a new mental health class to attend, stating that she fared better with the structure. A.R. 877.

The last treatment note is dated July 7, 2015, and written by Dr. Budjak. A.R. 875. He wrote that Llewellyn's depression was in partial remission, her PTSD was in remission, and her ADHD was currently well-controlled. A.R. 875.

### 2. Marion Isabel Zipperle, PhD

Marion Zipperle, PhD, performed a consultative psychological evaluation on April 11, 2016. A.R. 1004-1008. Dr. Zipperle reviewed Llewellyn's medical history, including psychiatric treatment notes listing Llewellyn's diagnoses of ADHD, PTSD, and major depression. A.R. 1004-05. Llewellyn reported to Dr. Zipperle that she has suffered from depression since she was a teenager. A.R. 1004. She has had problems with motivation, being active, over-sleeping, and caring

for her children. A.R. 1004. She lives on her parents' property because she cannot sustain herself independently, and they help her care for her children and complete basic household tasks such as cooking. A.R. 1004. Llewellyn relayed that she was sexually molested by a hairdresser as a child, and that incident contributes to her depression and laid the foundation for her PTSD. A.R. 1005. She also had a ten-year relationship with a physically abusive man who beat her, and she had to obtain a restraining order against him. A.R. 1005. Llewellyn had another abusive relationship after that, and reported that she stayed in both abusive relationships because she is codependent and cannot function on her own. A.R. 1005. Symptoms of her PTSD include nightmares, intrusive thoughts, problems with anxiety around people, difficulty adapting to change, and problems with making good decisions. A.R. 1005. Llewellyn also reported that she has had issues with food, including bulimia as a child and overeating as an adult. A.R. 1005. Her ADHD symptoms include issues with impulsive behavior, concentration, and learning from consequences. A.R. 1005.

Upon review of Llewellyn's psychiatric history, Dr. Zipperle concluded that Llewellyn has had difficulty finding the right medication to handle her symptoms. A.R. 1005. Although Llewellyn has apparently made efforts at treatment, including medication and counseling, Dr. Zipperle noted that Llewellyn's response to treatment has been "poor." A.R. 1005. Dr. Zipperle also noted that Llewellyn has a history of suicidal acting out. A.R. 1005.

Dr. Zipperle recorded that Llewellyn has problems with being persistent, finishing tasks, and being reliable. A.R. 1006. Dr. Zipperle noted that Llewellyn does not pace herself well, and her depression often leaves her in bed. A.R. 1006. She has difficulty remembering what she reads or what is told to her, and she lives in anger because of her problems. A.R. 1006. Dr. Zipperle recorded that Llewellyn was cooperative, but her behavior was emotional, tearful, angry, and she appeared depressed. A.R. 1006. Although her speech was logical, it was depressed. A.R. 1006. Dr. Zipperle noted that Llewellyn experiences negative thoughts, has rigid thinking, and problems with reality testing. A.R. 1006.

Dr. Zipperle concluded that Llewellyn has had mental health problems since she was twelve years old, and has since suffered depression that seems to be secondary to PTSD. A.R. 1007. Dr. Zipperle opined that Llewellyn's PTSD started with the molestations she suffered as a child. A.R.

1007. As an adult, Llewellyn became involved with physically abusive men who beat her, which in turn lowered her self-esteem even further. A.R. 1007. Dr. Zipperle opined that this history has led to issues with her sleeping and problems with motivation. A.R. 1007. It also aggravates her ADHD, as it increases her difficulty in finishing tasks, concentration, and coping with life. A.R. 1007. Dr. Zipperle also found that although Llewellyn can physically take care of herself, she has difficulty with self-care and relies on other people to take care of her. A.R. 1007. Dr. Zipperle noted that Llewellyn appears to be active in treatment but has problems using the skills she learns in treatment. A.R. 1007. Dr. Zipperle concluded that Llewellyn's problems have deterred her from becoming an adult, and that these problems would not resolve within twelve months. A.R. 1007. Dr. Zipperle stated that Llewellyn's prognosis is poor. A.R. 1007.

With respect to Llewellyn's RFC, Dr. Zipperle opined that although Llewellyn is physically capable of doing simple and repetitive tasks, she is markedly impaired, both mentally and emotionally, in doing them consistently. A.R. 1008. Dr. Zipperle also opined that Llewellyn is markedly impaired in doing complex tasks, getting along with others, coping with authority figures, following instructions, and working consistently over a 40-hour work week, 8 hours a day, due to her mental health problems. A.R. 1008. Dr. Zipperle stated that these problems would present in the form of depression, as Llewellyn would struggle with following through on tasks, and "[o]ther people would end up doing the work for her." A.R. 1008. Dr. Zipperle also opined that Llewellyn is markedly impaired in coping with the normal stresses of work because she has problems with change, issues with time pressure, and gets overwhelmed at having to do more than one thing at a time. A.R. 1008.

### 3. State Agency Medical Consultants

Disability Employment Adviser S. Khulmann and Patricia Solomon, PhD reviewed Llewellyn's records and assessed her mental RFC on June 19, 2014. A.R. 75-87. Dr. Solomon opined that Llewellyn is moderately limited in several areas, including her ability to understand and remember detailed instructions, carry out detailed instructions, complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the

13

general public, and respond appropriately to changes in the work setting. A.R. 83-84. Dr. Solomon concluded that Llewellyn can "maintain adequate concentration and persistence and pace as needed to complete a full workday/workweek for simple tasks," but "would do best in an environment with limited public contact." A.R. 85. On reconsideration, Adrianne Gallucci, PsyD, reviewed the records and affirmed those findings. A.R. 89-102.

## IV. STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits. "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted). Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a mere scintilla, but less than a preponderance. *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir.1996) (internal citation omitted). When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Soc. Sec. Admin*., 466 F.3d 880, 882 (9th Cir. 2006) (citation and quotation marks omitted).

If the evidence reasonably could support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted). "Finally, the court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

## V. ISSUES PRESENTED

Llewellyn argues that the ALJ erred in assigning little weight to the medical opinion of Dr. Marion Zipperle. She argues that, as a result of the error, the ALJ erred in assessing Llewellyn's RFC.

The Commissioner cross-moves to affirm, arguing that the ALJ's decision is supported by

substantial evidence and is free of legal error.

## VI. DISCUSSION

### A. Weighing of the Medical Opinions

The ALJ discussed the medical evidence and gave great weight to the findings of the state agency medical consultants, but little weight to Dr. Zipperle's opinion. A.R. 29, 31. Llewellyn argues that the ALJ erred in giving little weight to Dr. Zipperle's opinion.

#### 1. Legal Standard

Courts employ a hierarchy of deference to medical opinions based on the relation of the doctor to the patient. Namely, courts distinguish between three types of physicians: those who treat the claimant ("treating physicians") and two categories of "nontreating physicians," those who examine but do not treat the claimant ("examining physicians") and those who neither examine nor treat the claimant ("non-examining physicians"). *See Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). A treating physician's opinion is entitled to more weight than an examining physician's opinion, and an examining physician's opinion is entitled to more weight than a non-examining physician's opinion. *Id*.

The Social Security Act tasks the ALJ with determining credibility of medical testimony and resolving conflicting evidence and ambiguities. *Reddick*, 157 F.3d at 722. A treating physician's opinion, while entitled to more weight, is not necessarily conclusive. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (citation omitted). To reject the opinion of an uncontradicted treating physician, an ALJ must provide "clear and convincing reasons." *Lester*, 81 F.3d at 830; *see, e.g.*, *Roberts v. Shalala*, 66 F.3d 179, 184 (9th Cir. 1995) (affirming rejection of examining psychologist's functional assessment which conflicted with his own written report and test results); *see also* 20 C.F.R. § 416.927(d)(2); SSR 96-2p, 1996 WL 374188 (July 2, 1996). If another doctor contradicts a treating physician, the ALJ must provide "specific and legitimate reasons" supported by substantial evidence to discount the treating physician's opinion. *Lester*, 81 F.3d at 830. The ALJ meets this burden "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick*, 157 F.3d at 725 (citation omitted). "[B]road and vague" reasons do not suffice. *McAllister v. Sullivan*, 888 F.2d

599, 602 (9th Cir. 1989). This same standard applies to the rejection of an examining physician's opinion as well. *Lester*, 81 F.3d at 830-31. A non-examining physician's opinion alone cannot constitute substantial evidence to reject the opinion of an examining or treating physician, *Pitzer v. Sullivan*, 908 F.2d 502, 506 n.4 (9th Cir. 1990); *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984), though a non-examining physician's opinion may be persuasive when supported by other factors. *See Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (noting that opinion by "non-examining medical expert . . . may constitute substantial evidence when it is consistent with other independent evidence in the record"); *Magallanes*, 881 F.2d at 751-55 (upholding rejection of treating physician's opinion given contradictory laboratory test results, reports from examining physicians, and testimony from claimant). An ALJ "may reject the opinion of a non-examining physician by reference to specific evidence in the medical record." *Sousa*, 143 F.3d at 1244. An opinion that is more consistent with the record as a whole generally carries more persuasiveness. *See* 20 C.F.R. § 416.927(c)(4).

### 2. Analysis

In April 2016, Dr. Zipperle performed a consultative psychological examination of Llewellyn. A.R. 1004-1008. Dr. Zipperle assessed a GAF score of 50[2], and opined that Llewellyn

---

[2] "There are five axes in the DSM diagnostic system, each relating to a different aspect of a mental disorder:

Axis I: This is the top-level diagnosis that usually represents the acute symptoms that need treatment; Axis I diagnoses are the most familiar and widely recognized (e.g., major depressive episode, schizophrenic episode, panic attack). Axis I terms are classified according to V-codes by the medical industry (primarily for billing and insurance purposes).

Axis II: This is the assessment of personality disorders and intellectual disabilities. These disorders are usually life-long problems that first arise in childhood.

Axis III: This is the listing of medical and neurological conditions that may influence a psychiatric problem. For example, diabetes might cause extreme fatigue, which may lead to a depressive episode.

Axis IV: This section identifies recent psychosocial stressors—the death of a loved one, divorce, loss of a job, etc.—that may affect the diagnosis, treatment, and prognosis of mental disorders.

Axis V: This section identifies the patient's level of function on a scale of 0–100, where 100 is the highest level of functioning. Known as the Global Assessment of Functioning ("GAF") Scale, it attempts to quantify a patient's ability to function in daily life."

had a number of marked limitations with respect to her ability to do unskilled work. A.R. 1008. These include ability to be consistent in doing simple and repetitive tasks; do complex tasks; get along with others; cope with authority figures; follow instructs; work consistently over a 40-hour workweek, 8 hours a day; and cope with the normal stress of work. A.R. 1008.

The ALJ discussed Dr. Zipperle's opinion and gave it little weight in favor of the opinions of the non-examining state agency medical consultants, who concluded upon review of the record that despite some moderate impairments, Llewellyn could perform unskilled work with limited public contact. A.R. 85, 99-100. Given these contradictions, the ALJ was required to provide "specific and legitimate reasons" supported by substantial evidence to reject the opinion of Dr. Zipperle. *Lester*, 81 F.3d at 830.

The ALJ gave the following reasons in support of her decision to assign little weight to the opinion of Dr. Zipperle:

> This was a one-time psychological examination and the results are not consistent with the medical evidence of the record, including mental status examination results and treatment notes indicating depression in remission, improved ADHD symptoms with medication, decreased irritability and anxiety, and higher global assessment functioning scores from treating providers.

A.R. 31. Upon review of the record, the court concludes that the ALJ erred with respect to Dr. Zipperle's opinion.

To the extent that the ALJ's decision was based on the fact that Dr. Zipperle administered a one-time examination, that rationale is an error. Llewellyn correctly notes that the hierarchy established in *Lester* already accounts for the differences between an ongoing treatment relationship and a non-treating examination. Pltf. Mot. at 9-10; *see Lester*, 81 F.3d at 830-31. One-time consulting evaluations are routinely performed in advance of administrative hearings, often at the

---

*Cantu v. Colvin*, No. 5:13-CV-01621-RMW, 2015 WL 1062101, at *6 (N.D. Cal. Mar. 10, 2015); *see also* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed. 2000) ("DSM–IV") at 27-34. The DSM-IV been replaced by the DSM-5, which eliminated the multiaxial system of diagnosis. The DSM-IV is discussed here because although ALJ did not give significant weight to the actual GAF scores, the ALJ took note that treating providers had assigned higher GAF scores than Zipperle. A.R. 31-32. Higher scores correspond with higher ability to function.

behest of the Commissioner. *See Cleghorn v. Colvin*, No. 15-cv-295 MRW, 2015 WL 8282508, at *3 (C.D. Cal. Dec. 8, 2015) (rejecting the rationale that a one-time examination discredits a physician's opinion); *Garcia v. Colvin*, No. 15-cv-7060 MRW, 2016 WL 3035109, at *5 (C.D. Cal. May 26, 2016) (finding that rationale is "a woefully weak basis for rejecting an examining physician's opinion"). The Commissioner appears to concede that it would be improper for the ALJ to discount Dr. Zipperle's opinion on this basis. Def. Mot. at 4. Accordingly, the court concludes that this is not a specific and legitimate reason supported by substantial evidence to reject Dr. Zipperle's opinion.

Moreover, the ALJ erred in discounting Dr. Zipperle's opinion on the basis that it contradicted the medical evidence in the records. The ALJ cited treatment notes from February 2012 that indicate Llewellyn felt better after taking anti-depressants and starting psychotherapy; notes from January 2015 that Llewellyn's depression was in full remission and her anxiety symptoms improved considerably with better control of ADHD symptoms; notes from February 2015 recording that Llewellyn had made several positive changes in her lifestyle, including taking walks and picking her son up from school; and notes from May 2015 that Llewellyn reported an increase in focus and concentration with medication. A.R. 332, 878, 884, 888.

While the cited evidence indicates that Llewellyn experienced some improvement at various points in time, "[r]eports of 'improvement' in the context of mental health issues must be interpreted with an understanding of the patient's overall well-being and the nature of her symptoms." *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014). The Ninth Circuit has recognized that "[c]ycles of improvement and debilitating symptoms are a common occurrence," and cautioned that it is "error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working." *Id*; *see also Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th Cir. 2001) ("That a person who suffers from severe panic attacks, anxiety, and depression makes some improvement does not mean that the person's impairments no longer seriously affect her ability to function in a workplace.").

Here, viewing the record as a whole, the evidence cited by the ALJ does not show a record of consistent improvement, but rather a cycling of recurrent symptoms. Although Llewellyn

1   reported decreased symptoms on February 16, 2012 (A.R. 332, 661, 937), just three days prior she
2   presented with depression symptoms and told her treating physician that she was depressed and felt
3   like she could not return to work. A.R. 650, 940. On January 14, 2014, Llewellyn presented with
4   symptoms of "severe depression," reporting that she had no energy or motivation. A.R. 684, 932-
5   33. She also stated that the medication that she had used in the past did not work for her. A.R. 933.
6   In February 2014, Llewellyn reported increased symptoms of depression, PTSD, and ADHD. A.R.
7   322. Although Llewellyn's symptoms briefly decreased following a prescription for Wellbutrin,
8   she returned to treatment in March 2014 reporting increased symptoms including depressed mood,
9   anhedonia, hypersomnia, low energy, and problems with concentration. A.R. 318. The cycling
10  pattern continues throughout the record. Llewellyn reported improvement for a few months between
11  May and July 2014 (A.R. 404, 401, 399, 397), followed by a return of symptoms in July 2014 that
12  continued through November 2014 (A.R. 394, 900, 897, 894, 891-82). The record reflects another
13  period of improvement starting in January 2015 (A.R. 884-87), although Llewellyn presented in
14  crisis in March 2015 following a confrontation with her ex-partner. A.R. 879-881.

15  The Commissioner argues that "[a]lthough Plaintiff experienced some symptom
16  exacerbation when she had to deal with significant life stressors . . . treatment notes otherwise
17  showed that her mental impairments were in partial or complete remission and well-controlled."
18  Def. Br. at 5-6. The Commissioner thus attempts to cast evidence of recurrent symptoms as merely
19  due to "medication adjustments or situational stressors." Def. Br. at 6. The record as a whole
20  contradicts the Commissioner's account. For example, on March 3, 2014, Llewellyn's treating
21  physician noted that it was "unclear why medication has ceased being effective, as [Llewellyn] is
22  on no other medications and she is not reporting any new stressors." A.R. 922. Although mental
23  health symptoms can be expected following stressful life events, the record shows recurrent
24  symptoms with and without new stressors. "[I]mproved functioning while being treated and while
25  limiting environmental stressors does not always mean that a claimant can function effectively in a
26  workplace." *Garrison*, 759 F.3d at 1017.

27  In sum, the court concludes that the ALJ failed to provide specific and legitimate reasons
28  supported by substantial evidence to discount Dr. Zipperle's opinion.

### B. Step Four Analysis

Llewellyn argues that the ALJ erred in assessing her RFC as a result of improperly rejecting Dr. Zipperle's opinion. Dr. Zipperle opined that Llewellyn is markedly impaired in her ability to be consistent in doing simple and repetitive tasks, and in her ability to get along with others, cope with authority figures, and follow instructions. A.R. 1008. Dr. Zipperle also opined that Llewellyn is markedly impaired in her ability to work consistently over a 40-hour workweek, 8 hours a day, due to mental health problems, and those problems would show themselves in the form of depression, issues with follow through, and problems with dependency on others. A.R. 1008. Dr. Zipperle stated that "[o]ther people would end up doing the work for her." A.R. 1008.

The ALJ assessed a mental RFC limiting Llewellyn to "simple, routine tasks" and "brief superficial contact with the public." A.R. 64-66. The VE's testimony at step five of the analysis was based on this RFC. A.R. 33; A.R. 65-66. Since the RFC assessment is tied to the ALJ's evaluation of the medical evidence, about which the court has found error, the ALJ must redetermine the RFC upon reevaluation of the medical evidence.

## VII. CONCLUSION

For the foregoing reasons, the court grants in part Llewellyn's motion, denies the Commissioner's cross-motion, and remands this case for further proceedings.

**IT IS SO ORDERED.**

Dated: March 18, 2019



Donna M. Ryu
United States Magistrate Judge